WILLIAM A. COPELAND *vs.* WILLIAM G. EATON & others.

Suffolk.    January 24, 25, 1911. — May 19, 1911.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & RUGG, JJ.

*Contract*, Construction.    *Patent*.    *Words*, "Interest."

In a suit in equity for the specific performance of a contract, it appeared that the defendant was the owner of a patent for a certain machine and that the plaintiff and the defendant made a contract in writing that the plaintiff should have an exclusive license to manufacture and sell the patented machine for five years, the seventh paragraph of the contract stating in detail a method of accounting for and of dividing the profits of the enterprise. The eighth paragraph provided in substance that, if "at the expiration of said licenses and of this contract" the defendant did not desire to renew the contract for a further term, he should "deliver such transfers, papers and instruments as will vest in the [plaintiff] . . . fifteen one-hundredths interest in and to said patent, . . . and also fifteen one-hundredths interest in and to all the profits arising from business in machines during the life or lives of said patents . . . and also

twenty one-hundredths interest in and to all the profits arising from the sale of rolls, spare parts and supplies furnished to said machines or protected in any manner by the patents aforesaid. Profits within the meaning of the foregoing provisions," it was provided, should "mean the differences between the manufacturing cost and the amount of the receipts in each instance as hereinbefore defined in Article VII., and all the provisions of that article shall apply to the parties hereto *mutatis mutandis.* And in the event the " defendant should desire " to sell said patent or patents and business done under them, and . . . obtain a *bona fide* offer therefor, then " the defendant was to communicate such offer to the plaintiff, who was to have ten days in which to " buy said patents and business " on the terms so offered, and, if he did so, he was given the right to " credit his fifteen one-hundredths interest in the purchase price and make payment for the balance of the purchase price at such times and in such manner as " might be agreed upon. In case he did not purchase, the defendant might sell to the person who had made the offer, " accounting to the [plaintiff] for his fifteen one-hundredths part of the proceeds of such sale as aforesaid. But in the event that the person making such offer " did not purchase, then no sale could be made " of said patents and business by the parties of the second part until a new offer " should " have again been submitted to the party of the first part and rejected by him in like manner as before." *Held,* that the words " interest in and to said patent," as used in the contract, meant a limited property right arising under and defined in the contract, which was less than absolute ownership, and that the plaintiff was not entitled at the termination of the contract to an assignment of the title to any part of the patent.

BILL IN EQUITY, filed in the Superior Court on August 9, 1909, seeking to compel the defendants to convey to the plaintiff a certain interest in a patent and in the profits from the manufacture of the patented machine, in accordance with what the plaintiff alleged to be the meaning of a contract between the parties, which is described in the opinion; also a

CROSS BILL in which the defendants sought an accounting from the plaintiff under the terms of the contract.

The case was heard by *Richardson,* J., and a commissioner was appointed under Equity Rule 35 to take the evidence.

The trial judge filed the following memorandum of his findings:

" 1. I find that the contract . . . was executed after a full examination and knowledge of all its terms and stipulations by all parties and their counsel.

" 2. I find that the license mentioned in said contract was terminated on July 1, 1909, and the defendants did not, at least for some time after that, express to the plaintiff a desire to have the license renewed or continued; and there was no agreement that the license should be renewed or that the business should go on as it had gone on from July 1, 1909; and there was no evidence of a purchase by the plaintiff or by anybody else

of the letters patent as was contemplated there might be in the last part of Article VIII. of the contract. A large portion of the things, which under Article X. of the said contract the plaintiff was to turn over to the defendants, was delivered to the defendants or upon their order and in accordance with their direction soon after July 1, 1909. . . . If there were a few things relating to 'machines' that were not delivered, it does not appear that the defendants made any complaint to the plaintiff, that they had not been delivered, down to the time of the hearing and down to the time of the hearing no demand was made for any other of the things relating to machines which were not delivered.

"3. Upon all the evidence I think the plaintiff is entitled to such 'transfers, papers and instruments as will vest in him upon and after July 1, 1909, 15/100 interest in and to said Letters Patent,' and in the other patents and inventions described in . . . the bill; and also is entitled to the performance of all other of the defendants' stipulations or promises in the first part of Article VIII.

"4. The defendants on their cross bill are entitled to an accounting of what of anything is due from the plaintiff to them for and during the period of, the license down to July 1, 1909."

A final decree was entered in accordance with the foregoing memorandum, except that no mention was made therein as to an accounting by the plaintiff to the defendants. The defendants appealed.

The facts are stated in the opinion.

*G. W. Anderson*, for the defendants.

*W. Quinby*, for the plaintiff.

RUGG, J. This is a suit in equity brought to enforce specifically certain terms of a contract touching letters patent. A cross bill was brought by the defendants asking affirmative relief.

The defendants, being owners of a patent issued by the United States for certain " machines " and " rolls," entered into an agreement with the plaintiff by which the latter was granted an exclusive license to manufacture and sell the patented devices for a term of five years. Article VII. of the contract regulated in detail the way in which the accounts of the plaintiff while

exercising the rights of manufacture and sale should be kept, what should be treated as manufacturing costs, and how the profits of the business should be computed, and in what proportion and at what times the part to which the defendants were entitled should be paid to them. The main difficulty arises in interpreting Article VIII. of the contract, which, so far as material, is as follows : " At the expiration of said licenses and of this contract, namely, on July 1, 1909, if the parties of the second part [the defendants] do not then desire to renew the said contract for a further term, they shall deliver such transfers, papers and instruments as will vest in the party of the first part [the plaintiff] from and after said July 1, 1909, fifteen-one-hundredths (15/100) interest in and to said patent . . . and also fifteen-one-hundredths (15/100) interest in and to all the profits arising from business in machines during the life . . . of said patents . . . and also twenty-one-hundredths (20/100) interest in and to all the profits arising from the sale of rolls, spare parts and supplies furnished to said machines or protected in any manner by the patents. . . . Profits within the meaning of the foregoing provisions shall mean the differences between the manufacturing cost and the amount of the receipts in each instance as hereinbefore defined in Article VII., and all the provisions of that article shall apply to the parties hereto *mutatis mutandis.* And in the event the parties of the second part desire to sell said patent or patents and business done under them, and in the event that they obtain a *bona fide* offer therefor, then the same shall be by them forthwith communicated to the party of the first part, and after the receipt of such communication by the party of the first part he shall have ten (10) days in which to determine whether he will buy said patents and business at said offer. The party of the first part may, if he is the purchaser of said patents and business, credit his fifteen-one-hundredths (15/100) interest in the purchase price and make payment for the balance of the purchase price at such times and in such manner as may be agreed upon. In the event the parties of the second part should not receive from the party of the first part notice of his intention to buy within ten days, then the parties of the second part may sell the same to the person making such offer for the amount of such offer, and

accounting to the party of the first part for his fifteen-one-hundredths (15/100) part of the proceeds of such sale as aforesaid. But in the event that the person making such offer does not purchase, then no sale can be made of said patents and business by the parties of the second part until a new offer shall have again been submitted to the party of the first part and rejected by him in like manner as before."

A right of renewal was given to the patentees. The judge of the Superior Court found that there was no renewal of the contract, and that it terminated on July 1, 1909. While his finding is not very clear as to whether the terms of Article X.* of the contract have been complied with by the plaintiff, we understand it to mean that it has been substantially performed, and that if in small particulars it has not been, specific performance has been waived by the conduct of the defendants. These conclusions of fact must stand as final under the familiar rule that they will not be disturbed unless plainly wrong. A perusal of the evidence discloses no ground for us to say that they should be set aside.

The pivotal controversy relates to the signification to be attributed to the word "interest" as used in Article VIII. of the contract, which required to be transferred to the plaintiff a fractional "interest in and to said patent." The word "interest" has not become a term of art in patent law, and has no technical meaning. It is elastic in use, and may convey in different connections a considerable variety of ideas. Excluding those which do not relate to a pecuniary concern in property, it has been held to be more comprehensive than title, and to be synonymous with it, to express less than title, and to be distinguishable from it, and to be broad enough to embrace all claims of every description, to include every right in the nature of property below title, and to refer to equitable rather than legal estates, the somewhat diverse meanings depending upon the relation in

---

* Article X of the contract was as follows: " At the expiration of this contract or of any renewal thereof, the party of the first part shall deliver without charge to the parties of the second part a list of the machines and their location, so far as known to the party of the first part, and also deliver all drawings, patterns, jigs, special tools, and the like, used by the party of the first part in and which would be naturally used in the manufacture of said machines."

which it is found and the subject to which it refers. It would not be profitable to review the cases. The end to be reached is an ascertainment of what this contract means in view of the relations of the parties, the matter about which they were dealing, the particular language employed, the other provisions of the contract, and the practical results likely to flow from the several constructions contended for. The contract recites that the parties are the owners of a patent who desired to enlarge the business of manufacturing and selling the patented articles, on one side, and a manufacturer possessed of capital, plant and organization of which the patentees desire to avail themselves, on the other. The relations were to continue for five years with a right of renewal reserved to the patentees alone. The plaintiff during the term of the contract had exclusive rights of manufacture and sale. The subject of the contract on which all its provisions hinged was a patent. This is a property right of a peculiar nature, with attributes which differentiate it from all other classes of property. The distinguishing characteristics of ownership in a patent are that in this country the number of such owners may be unlimited, each freely and without the consent of his co-owners may use the protected invention, without responsibility to them for profits, grant licenses for such use, and in his own name recover royalties or profits therefor, and assign and transfer his share to a purchaser, who would be free from liability for infringement to the other owners. The nature of a patent is such that joint owners in it "are at the mercy of each other." *McDuffee* v. *Hestonville Mantua & Fairmount Passenger Railway*, 162 Fed. Rep. 36, 39. *Steers* v. *Rogers*, [1893] A. C. 232. *Dunham* v. *Indianapolis & St. Louis Railroad*, 7 Biss. 223. *Mathers* v. *Green*, L. R. 1 Ch. 29. *Vose* v. *Singer*, 4 Allen, 226.

The word "interest" occurs in Article VIII. subsequently to the phrase above quoted, and there relates to the profits in which the plaintiff was to share arising from the business to be carried on during the life of the patents by the defendants after the expiration of the contract. In these connections, obviously it can refer only to an executory obligation on the part of the defendants to account for profits as they arise, — to a future potentiality and not to a present and existing title. It is natural

that a word repeated several times in the same paragraph should have the same meaning in each instance. Moreover, these profits are defined as meaning the same as in Article VII., all the provisions of which are to apply to the relations between the parties, springing into existence after the expiration of the contract "*mutatis mutandis.*"' These two words mean necessary changes in details to conform to a single vital alteration. Together with reference to this clause of definition, they speak strongly of a reversal of the relative positions of the parties as to the real purpose of the contract, which was to continue the same in other respects. The chief end of the contract was to make money for all concerned by vesting the exclusive right of manufacture and sale under the monopoly of the patent in one party. During the term of the contract, the plaintiff was to manufacture and sell exclusively and share the profits, calculated according to the rule established by the agreement, with the defendants. *Mutatis mutandis* in this connection conveys the thought that after the expiration of the time limited in the contract, the defendants were to have the exclusive rights of manufacture and sale, subject to a similar obligation to share the profits, calculated in the same way, with the plaintiff. It hardly seems probable that the parties would have been so careful to provide for an accounting by the patentees, who would be compelled to start anew in business after an interruption of five years, if the plaintiff, who is by the contract described as possessed of " capital, plant and organization " had such rights of title to the patent as would enable him to continue the business established under the license without material interruption.

The terms as to the sale point to ownership of the entire patent by the defendants. Their desire " to sell said patent " is made the turning point of a sale. If the plaintiff exercises his option to purchase, he is authorized to credit himself with his fractional interest in the price, but if he does not, the defendants are authorized to " sell the same," that is, the patents, and not eighty-five one-hundredths of them, and to receive the entire purchase price, with obligation only to account to the plaintiff for his part. This power implies entirety of title. The practical effect of the interpretation contended for by the plaintiff renders the patent itself of little or no value to the weaker

party.　The distinguishing characteristic of a patent is that it enables the holder to prevent everybody else from manufacturing the protected article, except upon terms imposed by the patentee.　As between hostile co-owners, the one of larger resources has a great advantage, but the means for conserving the special benefits which the patent confers no longer exist.　An interpretation of a contract which would lead to this result would not ordinarily be given unless the language plainly required it.　The words of the agreement before us bear no such indication.　On the contrary, they show an intent to maintain the integrity of the patent and an employment of its protection in the use which would yield its largest value to all those having a right to share in its profits.　These considerations all lead to the conclusion that under the contract the plaintiff is not entitled to a present assignment of the title to any part of the patent.　"Interest" as used in this agreement is something different from title.　It means a limited property right arising under and defined in the contract, less than an absolute ownership.　He is entitled to his fractional part in the proceeds of a sale when one is made, to a preferential option to buy at the same price offered by any outsider crediting his interest toward such purchase price, and to a share in the profits, as defined by the contract, of the business of manufacture and sale based on the patent while carried on by the defendants.　He is entitled to a decree to that effect.

The decree in favor of the plaintiff is reversed.　Upon their cross bill, the defendants are entitled to an accounting under the contract prior to July 1, 1909, and to a general accounting for all use made by the plaintiff of the patents since July 1, 1909.

*So ordered.*